No. 23-12551-EE

_____

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

**UNITED STATES OF AMERICA**,

*Appellee*

v.

**DAVID ROBINSON JR.**,

*Appellant*

_____

Appeal from the United States District Court
for the Middle District of Florida

No. 5:22-cr-00072-GAP-PRL

_____

**APPELLANT'S INITIAL BRIEF**

_____

A. FITZGERALD HALL, ESQ.
Federal Defender

MATTHEW D. CAVENDER, ESQ.
Research and Writing Attorney
201 South Orange Ave., Suite 300
Orlando, FL 32801
407-648-6338
Matthew_Cavender@fd.org

*Counsel for Appellant*

No. 23-12551-EE

*United States v. David Robinson Jr.*

# CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

The following persons have an interest in the outcome of this case:

Andrejko, Nicole M.

Bailey, Lynn Palmer

Bird, Christine Nan

Bodnar Jr., Robert E.

Cavender, Matthew D.

Hall, A. Fitzgerald

Handberg, Roger B.

Lammens, Honorable Philip R.

Presnell, Honorable Gregory A.

Rhodes, David P.

Robinson Jr., David

Siekkinen, Sean

Stamm, Douglas Jordan

Swartzberg, Sarah Janette

No publicly traded company or corporation has an interest in the outcome of this case.

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Robinson requests oral argument. Issues I and II are issues of first impression in this circuit and argument from counsel familiar with the case may assist this Court in resolving these issues.

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure Statement ................................................................... C-1

Statement Regarding Oral Argument ..................................... i

Table of Contents ............................................................... ii

Table of Citations ............................................................. iv

Jurisdictional Statement.................................................. viii

Statement of the Issues.................................................... 1

Statement of the Case ...................................................... 2

    I.    Course of proceedings and disposition below ......................... 2

    II.    Statement of the facts ............................................ 2

        A.    Offense conduct and indictment ................................... 2

        B.    Motion to dismiss the indictment ................................. 3

        C.    Stipulated-facts bench trial ........................................ 4

        D.    Presentence investigation report................................. 5

        E.    Sentencing and judgment ......................................... 5

    III.    Standard of review ................................................ 6

Summary of the Argument ................................................ 7

Argument........................................................................ 8

    I.    Background of the NFA .......................................... 8

    II.    The NFA violates the Second Amendment........................... 11

A.    Regulations that restrict presumptively protected Second Amendment conduct must be consistent with the country's historical tradition.............................11

B.    Mr. Robinson's conduct is protected by the Second Amendment. ...............................................................15

    1.    Mr. Robinson is part of "the people." .................15

    2.    Possessing a short-barrel rifle constitutes keeping or bearing arms. ....................................15

C.    The government cannot show a historical tradition of requiring pre-possession registration of short-barrel rifles..................................................................21

D.    The NFA is an unconstitutional may-issue licensing regime. .......................................................22

III.    The NFA is an unconstitutional tax on the exercise of a constitutional right. .............................................................24

IV.    The NFA exceeds Congress's power to tax and violates the Tenth Amendment. ........................................................29

Conclusion .............................................................................31

Certificate of Compliance .....................................................32

# TABLE OF CITATIONS

## Cases

*Cent. Fla. Nuclear Freeze Campaign v. Walsh*,
774 F.2d 1515 (11th Cir. 1985) ...................................... 26–28

*Cox v. New Hampshire*,
312 U.S. 569 (1941) .............................................. 24, 26, 28

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ...................................... 12, 16, 18–20, 27

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) ............................................ 18

*Heller v. District of Columbia*,
801 F.3d 264 (D.C. Cir. 2015) .............................................. 27

*Kwong v. Bloomberg*,
723 F.3d 160 (2d Cir. 2013)................................................. 27

*McCulloch v. Maryland*,
17 U.S. 316 (1819) ......................................................... 28–29

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ........................................... 12, 14, 23, 27

*Murdock v. Pennsylvania*,
319 U.S. 105 (1943) ................................................. 24–26, 28

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) ................................................. 12–15, 21–24

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) .................................................. 24, 29–30

*United States v. Bolatete*,
977 F.3d 1022 (11th Cir. 2020) ................................. 12, 27, 29

*United States v. Jordan,*
635 F.3d 1181 (11th Cir. 2011) ................................................ 6

*United States v. Miller*,
307 U.S. 174 (1939) ............................................ 4, 18, 19, 20

## Constitutional Provisions

U.S. Const. amend. I ........................................................ 4

U.S. Const. amend. II .................................... 3–4, 7, 11, 15

U.S. Const. amend. V ........................................................ 3

U.S. Const. amend. X ........................................... 3, 7, 31

U.S. Const. art. I, § 8, cl. 1 ..................................... 29–30

## Statutes

18 U.S.C. § 3231 ......................................................... viii

18 U.S.C. § 3742 ......................................................... viii

18 U.S.C. § 5841 ....................................................... 3, 9

18 U.S.C. § 5861 ....................................................... 3, 8

18 U.S.C. § 5871 ................................................... 3, 9, 30

26 U.S.C. § 5811 ................................................ 9, 28–29

26 U.S.C. § 5812 ..................................................... 9–10

26 U.S.C. § 5845 ............................................... 8–9, 29

28 U.S.C. § 1291 ......................................................... viii

28 U.S.C. § 1294 ......................................................... viii

National Firearms Act of 1934, 26 U.S.C. § 5801, *et seq.* ............. 3, 8

National Firearms Act of 1934, Pub. L. No. 73-474, § 3, 48 Stat. 1236 .................................................................................... 28

## Regulations

27 C.F.R. § 478.98 ................................................................. 10, 22

27 C.F.R. § 479.84 .................................................................. 9–10

27 C.F.R. § 479.85 ...................................................................... 10

27 C.F.R. § 479.86 .................................................................. 10–11

## Other Authorities

Brian L. Frye, *The Peculiar Story of* United States v. Miller, 3 N.Y.U. J.L. & Liberty 48 (2008) ........................................... 19

Bureau of Alcohol, Tobacco, Firearms and Explosives, *ATF History Timeline*, https://www.atf.gov/our-history/atf-history-timeline ................................................................. 30

Bureau of Alcohol, Tobacco, Firearms and Explosives, *Current Processing Times*, https://www.atf.gov/resource-center/current-processing-times .................................... 11, 23

David T. Hardy, T*he Firearms Owners' Protection Act: A Historical and Legal Perspective*, 17 Cumb. L. Rev. 585 (1987) ....................................................................................... 8

FBI Criminal Justice Information Services Division, *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015–2019*, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/expanded-homicide-data-table-8.xls ....................................................... 17

James A. D'Cruz, *Half-Cocked: The Regulatory Framework of Short-Barrel Firearms*, 40 Harv. J. L. & Pub. Pol'y 493 (2017) ............................................................................... 8, 20

National Shooting Sports Foundation, *Firearm Production in the United States With Firearm Import and Export Data* (2020), https://www.nssf.org/wp-content/uploads/2020/11/IIR-2020-Firearms-Production-v14.pdf ................................................................ 17

Oliver Krawczyk, *Dangerous and Unusual: How an Expanding National Firearms Act Will Spell Its Own Demise*, 127 Dick. L. Rev. 273 (2022) ............................... 8, 16

The American Revolution Institute, *Blunderbuss, the "Thunder Box" of the Battlefield*, https://www.americanrevolutioninstitute.org/recent-acquisitions/english-blunderbuss/ ........................................ 21

## JURISDICTIONAL STATEMENT

This is a direct appeal from the final judgment in a criminal case, entered by the United States District Court for the Middle District of Florida, Ocala Division, on July 21, 2023. Doc. 81. The district court had original jurisdiction under 18 U.S.C. § 3231.

Mr. Robinson timely filed a notice of appeal on August 4, 2023. Doc. 86. This Court has jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. §§ 1291, 1294.

## STATEMENT OF THE ISSUES

I.    Whether the National Firearms Act violates the Second Amendment.

II.   Whether the National Firearms Act is an unconstitutional tax on the exercise of a constitutional right.

III.  Whether the National Firearms Act exceeds Congress's power to tax.[1]

---

[1] This argument is foreclosed by binding precedent, but Mr. Robinson raises it to preserve it for further appellate review.

## STATEMENT OF THE CASE

# I.   Course of proceedings and disposition below

The government charged David Robinson Jr. with possessing an unregistered short-barrel rifle. Doc. 1. After a stipulated-facts bench trial, the district court found him guilty and sentenced him to 18 months' probation. Docs. 64, 81.

Mr. Robinson is on probation under this judgment; he is not incarcerated.

# II.   Statement of the facts

## A.   Offense conduct and indictment

Mr. Robinson was sleeping in his vehicle when he was awoken by law enforcement. Doc. 76 (PSR) ¶ 6. Startled, he drove several hundred feet down the street before stopping. *Id.* Law enforcement detained him and searched his vehicle. *Id.*

The search uncovered various items, including an AR-15-style rifle.[2] PSR ¶ 7. The rifle's barrel was about 12.5 inches long. PSR ¶ 10. The rifle was not registered with the National Firearms Registration and

---

[2] The other items are not relevant to this appeal.

Transfer Records. *Id.*

The government charged Mr. Robinson with possessing an unregistered short-barrel rifle, in violation of 18 U.S.C. §§ 5841, 5861(d), and 5871. Doc. 1.

### B.    Motion to dismiss the indictment

Mr. Robinson moved to dismiss the indictment for four reasons:

(1)    The National Firearms Act of 1934 (NFA), 26 U.S.C. § 5801, *et seq.*, violates his Second Amendment rights.

(2)    The NFA is unconstitutional because punishing the possession of an unregistered firearm exceeds Congress's taxation power and violates the Tenth Amendment.

(3)    The NFA is unconstitutional because it taxes the exercise of his Second Amendment rights.

(4)    The charged offense is unconstitutionally vague, violating the Due Process Clause of the Fifth Amendment.

Doc. 32 at 2. The government responded in opposition, arguing:

(1)    The Second Amendment does not protect short-barrel rifles because they are "dangerous and unusual weapons" that are "not grounded in this country's historical tradition."

(2)    Mr. Robinson's Tenth Amendment challenge is foreclosed by binding precedent.

(3)    The NFA is not a tax on Second Amendment rights because short-barrel rifles are not protected by the Second Amendment.

(4)    Mr. Robinson's due process challenge is foreclosed by binding

3

precedent and, in any event, the charged offense is not unconstitutionally vague.

Doc. 40 at 4, 6, 8, 12–13. In reply, Mr. Robinson reiterated his earlier arguments. Doc. 48 at 2, 6, 8–9.

Without holding a hearing, the district court denied Mr. Robinson's motion. Doc. 53. The district court held that, pursuant to *United States v. Miller*, 307 U.S. 174 (1939), the Second Amendment does not guarantee the right to keep and bear short-barrel rifles. Doc. 53 at 8. The district court also held that the NFA was a permissible exercise of Congress's taxing power. *Id.* at 9. As to Mr. Robinson's tax-on-constitutional-rights argument, the district court held that short-barrel rifles are not protected by the Second Amendment and that First Amendment fee jurisprudence does not apply to the Second Amendment context. *Id.* at 10. Finally, the district court held that the NFA is not unconstitutionally vague. *Id.* at 13.

### C.    Stipulated-facts bench trial

After the denial of Mr. Robinson's motion to dismiss, he waived his right to a jury trial and proceeded to a stipulated-facts bench trial, at which the district court found him guilty. Docs. 60–62, 64.

4

### D.    Presentence investigation report

The PSR prepared by the United States Probation Office calculated that Mr. Robinson had a total offense level of 15 and, with no criminal record, a criminal history category of I, resulting in a Guidelines range of 18 to 24 months. PSR ¶¶ 25, 28–29, 61.

### E.    Sentencing and judgment

At sentencing, neither party objected to the PSR. Doc. 99 at 4. In mitigation, Mr. Robinson pointed out that although the facts as described in the PSR appeared troubling at first glance, they were, in fact, entirely innocent (his possession of the unregistered short-barrel rifle aside). *See* Doc. 99 at 6–8.

The district court, after expressing that it was "not sure society would benefit from putting this young man in jail for any period of time" and that it "[did not] think a prison term would satisfy any legitimate societal goal," imposed a sentence of 18 months' probation with 6 of those months on home detention. *Id.* at 13–15. Neither party objected to the sentence or to the way the district court pronounced it. *Id.* at 16–17.

A written judgment followed. Doc. 81.

## III.  Standard of review

This Court reviews the constitutionality of a statute de novo. *United States v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011).

## SUMMARY OF THE ARGUMENT

The National Firearms Act of 1934 (NFA) is unconstitutional under the Second Amendment. The plain text of the Second Amendment covers Mr. Robinson's conduct of possessing a short-barrel rifle, so that conduct is presumptively protected. The Second Amendment's protections extend to short-barrel rifles because they are in common use and are typically possessed by law-abiding citizens for lawful purposes. The government cannot meet its burden of showing a historical tradition of barring possession of short-barrel rifles unless they are first registered with the government. Accordingly, the NFA violates the Second Amendment.

The NFA is also an unconstitutional tax on the exercise of a constitutional right under the Supreme Court's fee jurisprudence. A license or registration tax is permissible only if it is geared to meet the expenses incident to administering the regulation, not if it is a flat tax charged for the enjoyment of a constitutional right. The $200 flat tax required to register a short-barrel rifle is a charge for the enjoyment of a constitutional right and is therefore unconstitutional.

The NFA also exceeds Congress's power to tax and thus violates the Tenth Amendment.

**ARGUMENT**

## I.  Background of the NFA

In the midst of the Great Depression, Congress enacted the National Firearms Act of 1934 (NFA), 26 U.S.C. § 5801, *et seq.*, the first major piece of federal gun control legislation in United States history. Oliver Krawczyk, *Dangerous and Unusual: How an Expanding National Firearms Act Will Spell Its Own Demise*, 127 Dick. L. Rev. 273, 276 (2022). The NFA was originally enacted to combat Prohibition-era street violence. *See generally* James A. D'Cruz, *Half-Cocked: The Regulatory Framework of Short-Barrel Firearms*, 40 Harv. J. L. & Pub. Pol'y 493, 496–501 (2017) (tracing the NFA's history and later amendments); David T. Hardy, T*he Firearms Owners' Protection Act: A Historical and Legal Perspective*, 17 Cumb. L. Rev. 585, 589–627 (1987) (same).

Among other restrictions, the NFA makes it unlawful for a person to possess certain firearms that are not registered to them in the National Firearms Registration and Transfer Record. 26 U.S.C. § 5861(d). The NFA defines "firearm" to include "a rifle having a barrel or barrels of less than 16 inches in length," 26 U.S.C. § 5845(a)(3), colloquially known as a short-barrel rifle. Violating § 5861(d) carries a penalty of up to ten years

8

imprisonment. 26 U.S.C. § 5871.

The registration requirement applies to the transferor of the qualifying firearm, not the transferee.[3] 26 U.S.C. § 5841(b). Likewise, the transferor must pay a $200 flat tax for each firearm transferred.[4] 26 U.S.C. §§ 5811(a), (b). Even though the transferor is directly responsible for the registration requirement and payment of the tax, the transferee may not possess the firearm until it has been properly registered and the tax paid. 26 U.S.C. § 5812(b).

Registering an NFA firearm is not a simple process. Along with paying the tax, the transferor must file a "Form 4" application with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF).[5] 26 U.S.C. § 5812(a); 27 C.F.R. § 479.84(a). The application demands a vast swath of information, including the transferor's and transferee's names and addresses, a description of the firearm, and, for a short-barrel rifle, the

---

[3] "Transfer" includes "selling, assigning, pledging, leasing, loaning, giving away, or otherwise disposing of" the firearm. 26 U.S.C. § 5845(j).

[4] The exception is for a firearm classified as "any other weapon," which has a transfer tax of $5. 26 U.S.C. § 5811(a).

[5] The current application is available at https://www.atf.gov/file/61546/download.

length of the barrel. 26 U.S.C. § 5812(a); 27 C.F.R. § 479.84(a). Also required is a passport-style photograph and two FBI fingerprint cards from the transferee. 26 U.S.C. § 5812(a)(3); 27 C.F.R. § 479.85(a).

A person seeking to possess a short-barrel rifle must leap an additional regulatory hurdle. For a short-barrel rifle, the application must include a sworn statement from the transferee providing "[t]he reasons why there is a reasonable necessity for [the transferee] to purchase or otherwise acquire the device or weapon," and stating that the transferee's "receipt or possession of the device or weapon would be consistent with public safety." 27 C.F.R. § 478.98.

Before filing the application with ATF, the transferee also must send a completed copy of the application to the chief law enforcement officer of their locality. 27 C.F.R. § 479.84(c).

The transferee may not take possession of the firearm until ATF has approved the application. 26 U.S.C. § 5812(b); 27 C.F.R. §§ 479.84(a), 479.86. But that is an agonizingly slow process. As of February 1, 2024, the average processing time for a Form 4 application is over 6 months—196 days for an electronic form and 243 days for a paper form. Bureau of Alcohol, Tobacco, Firearms and Explosives, *Current Processing Times*

(ATF, *Current Processing Times*), https://www.atf.gov/resource-center/current-processing-times (last viewed February 20, 2024) (https://perma.cc/36ZM-MPWP).

And the restrictions do not end even if the application is approved. The transferee must keep a copy of the approved application and must give it to any curious ATF officer upon request. 27 C.F.R. § 479.86.

## II. The NFA violates the Second Amendment.

> A well regulated Militia,
> being necessary to the
> security of a free State,
> the right of the people
> to keep and bear Arms,
> shall not be infringed.

U.S. Const. amend. II.

Possessing a short-barrel rifle is presumptively protected by the Second Amendment. That presumption puts the burden on the government to show a historical tradition of requiring people to register short-barrel arms before possessing them. The government cannot meet that burden.

### A. Regulations that restrict presumptively protected Second Amendment conduct must be consistent with the country's historical tradition.

The Second Amendment, the Supreme Court held, protects an

individual right to keep and bear arms independent of militia service. *District of Columbia v. Heller*, 554 U.S. 570, 583–84 (2008). This right applies equally to the States. *McDonald v. City of Chicago*, 561 U.S. 742, 749 (2010).

After *Heller* and *McDonald*, this Court (and many others) applied a two-step approach in Second Amendment cases. *See United States v. Bolatete*, 977 F.3d 1022, 1036 (11th Cir. 2020) ("We use a two-step inquiry when deciding a Second Amendment issue. First, we ask if the restricted activity is within the scope of protection of the Second Amendment in the first place. If it is, we apply an appropriate form of means-end scrutiny." (citation omitted)). But in *New York State Rifle & Pistol Ass'n v. Bruen*, the Supreme Court rejected the two-step approach as being "one step too many." 597 U.S. 1, 19 (2022). Instead, the Supreme Court adopted a test divorced from means-end scrutiny. *See id.* at 23.

Under the *Bruen* test, if "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 17. If the individual's conduct is presumptively protected, a firearm regulation "falls outside the Second Amendment's unqualified command" "[o]nly if [the] firearm regulation is consistent with this

12

Nation's historical tradition." *Id.* (citation omitted). Under that test, the government bears the burden of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19.

How the government must carry its burden depends on the problem that the regulation purports to address. If "a challenged regulation addresses a general societal problem that has persisted since the 18th century," then the historical inquiry is "fairly straightforward." *Id.* at 26. That historical inquiry begins by deciding whether "a *distinctly similar* historical regulation address[ed] that problem." *Id.* (emphasis added). If earlier generations did not regulate the problem, or if they regulated it "through materially different means," then that is relevant evidence that the challenged regulation conflicts with the Second Amendment. *Id.* at 26–27.

But if the challenged regulation implicates "unprecedented societal concerns," "dramatic technological changes," or regulations "unimaginable at the founding," then the inquiry will require considering "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 28–29. This analogical review requires

13

determining whether historical regulations are "*relevantly similar*" to the challenged regulation. *Id.* at 29 (citation omitted and emphasis added). When considering whether regulations are relevantly similar, "'*central*' considerations" include "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 29 (quoting *McDonald*, 561 U.S. at 767). Although the government need not identify a "historical *twin*," the analogical inquiry has its limits: "courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Id.* at 30 (cleaned up and citation omitted).

Whether the government must show a "distinctly similar" predecessor or a "relevantly similar" historical analogue, the "comparable tradition of regulation" must be clear; the required showing cannot rest on historical outliers. *Id.* at 27, 70. The government must show that historical regulations were both commonly accepted and enforced. *See id.* at 58 (noting the minimal evidence that surety laws were ever enforced).

The burden of proving the historical tradition justifying a firearm regulation rests on the government. *Id.* at 19, 24. This Court is "not

obliged to sift the historical materials for evidence to sustain [the challenged] statute," *id.* at 60, and the people subject to the challenged regulation do not bear the burden of delineating the extent of the Second Amendment right, *see id.* at 24–25.

### B. Mr. Robinson's conduct is protected by the Second Amendment.

Under *Bruen*, the first question asks whether Mr. Robinson's conduct is protected by the Second Amendment's plain text: "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. To answer that question in the affirmative, Mr. Robinson must show (1) that he is "among 'the people' entitled to the right"; and (2) that his "course of conduct" constitutes keeping or bearing arms. *Bruen*, 597 U.S. at 31–32.

#### 1. *Mr. Robinson is part of "the people."*

The first question is easy. Mr. Robinson is an adult citizen who has no criminal record and does not labor under any other infirmity that could take him outside of "the people" to whom the Second Amendment applies. The government has not advanced an argument to the contrary.

#### 2. *Possessing a short-barrel rifle constitutes keeping or bearing arms.*

Just as Mr. Robinson is in the class of people protected by the

Second Amendment, the short-barrel rifle he possessed is in the class of "arms" protected by the Second Amendment. Under *Heller*, the Second Amendment's protections extend to "all instruments that constitute bearable arms" that are "in common use" and that are "typically possessed by law-abiding citizens for lawful purposes." 554 U.S. at 582, 627.

Short-barrel rifles certainly constitute "bearable arms," so the only questions are whether they are "in common use" and are "typically possessed by law-abiding citizens for lawful purposes." *Id.* Even with the NFA's onerous regulatory requirements, the number of short-barrel rifles in circulation has grown more than 700% over the last decade. In 2011, there were about 75,000 registered short-barrel rifles across the country. Krawczyk, *supra*, at 295. Ten years later, that number exploded to about 532,000. *Id.*

Despite these ballooning numbers, however, rifles of all types are rarely used to commit crimes. There is no definitive answer to the question of how many rifles are in the country, but one estimate says that over 43 million semi-automatic rifles entered the United States market

between 1990 and 2018.[6] National Shooting Sports Foundation, *Firearm Production in the United States With Firearm Import and Export Data* 17 (2020), https://www.nssf.org/wp-content/uploads/2020/11/IIR-2020-Firearms-Production-v14.pdf (https://perma.cc/TT3N-BR5G) (last viewed Feb. 20, 2024). Yet in the five-year period from 2015 to 2019 (the last year for which FBI data is available), there was a nationwide average of 315 murders per year by all rifles, both short-barrel and long-barrel. FBI Criminal Justice Information Services Division, *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015–2019*, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/expanded-homicide-data-table-8.xls (https://perma.cc/422T-W3G9) (last viewed January 18, 2024). That is 315 murders out of average totals of 14,556 murders of all types and 10,251 murders-by-firearm—0.02% and 0.03%, respectively. *Id.* Since short-barrel rifles make up roughly 1% of the rifles in the United States (532,000 out of 43,000,000), the number of annual murders committed with a short-barrel rifle is likely in the single digits. *Cf. Heller v. District of Columbia*,

---

[6] This number does not even include all rifles, as it excludes bolt-action rifles.

17

670 F.3d 1244, 1269–70 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("[S]emi-automatic *handguns* are used in connection with violent crimes far more than semi-automatic *rifles* are.").

Despite the NFA's arduous restrictions, there are over a half-million short-barrel rifles in the United States today, yet they are virtually never used to commit crimes. *See id.* at 1290 (Kavanaugh, J., dissenting) ("[I]t is difficult to make the case that semi-automatic rifles are significantly more dangerous than semi-automatic handguns, and the Supreme Court has already held semi-automatic handguns to be constitutionally protected.") Thus, they are "bearable arms" that are "in common use" and are "typically possessed by law-abiding citizens for lawful purposes," and their possession is therefore protected by the Second Amendment. *Heller*, 554 U.S. at 582, 627.

The district court relied on *United States v. Miller*, 307 U.S. 174 (1939) to conclude otherwise, but that was error. That case involved two would-be bank robbers who were arrested while in possession of an unregistered short-barrel shotgun. *Miller*, 307 U.S. at 175. The district court quashed the indictment on Second Amendment grounds, but the government appealed directly to the Supreme Court. *Id.* at 177. Counsel

18

for the defendants did not submit a brief or even bother to appear for oral argument. *See id.* at 175. The only relevant paragraph of analysis in the five-page opinion provides, in full:

> In the absence of any evidence tending to show that possession or use of a "shotgun having a barrel of less than eighteen inches in length" at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.

*Id.* at 178 (citation omitted).

It is unclear what relevance this passage still holds given *Heller*'s holding that the Second Amendment protects an individual right, not a right dependent on service in a militia. 554 U.S. at 583–84. *Heller* also essentially cabined *Miller* to its facts. *See id.* at 623 ("*Miller* stands only for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons."); *see also* Brian L. Frye, *The Peculiar Story of* United States v. Miller, 3 N.Y.U. J.L. & Liberty 48, 69 (2008) ("[F]ew Second Amendment scholars spend much time analyzing *Miller*, because few take it seriously."). It would be "particularly wrongheaded to read *Miller* for more than what it said,

19

because the case did not even purport to be a thorough examination of the Second Amendment." *Heller*, 554 U.S. at 623.

Despite its shortcomings, *Miller* has not been explicitly overruled, so this Court cannot ignore it. But neither should this Court read it for more than what it says. First, *Miller* involved a short-barrel *shotgun*, not a short-barrel *rifle*. *Miller*, 307 U.S. at 178. And the only substantive paragraph of analysis about that firearm focused on the "absence of any evidence" about its use by the militia and the Court's inability to take judicial notice about that use. *Id.*

That is not this case. The post-*Heller* Second Amendment analysis focuses on the weapon's use by an individual, not as a member of the militia. *See Heller*, 554 U.S. at 583–84. And there can be little doubt that short-barrel rifles are useful individual weapons. *See* D'Cruz, *supra*, at 504 (noting that the standard-issue rifle for the United States Army and Marine Corps infantry is an M4 carbine with a 14.5-inch barrel). As the Supreme Court recognized in *Heller*, the only surviving holding from *Miller* is that the Second Amendment's protections "extend[ ] only to certain types of weapons." 554 U.S. at 623. It does not hold that short-barrel rifles specifically are not protected by the Second Amendment.

**C.    The government cannot show a historical tradition of requiring pre-possession registration of short-barrel rifles.**

The ready availability of short-barrel firearms is not a "dramatic technological change" that was "unimaginable at the founding." *Bruen*, 597 U.S. at 28–29. Because the availability of short-barrel firearms is a "general societal problem that has persisted since the 18th century," the government must show a "distinctly similar historical regulation" that addressed the issue, *id.* at 26, rather than a "relevantly similar" historical analogue, *id.* at 29; *see also* The American Revolution Institute, *Blunderbuss, the "Thunder Box" of the Battlefield*, https://www.americanrevolutioninstitute.org/recent-acquisitions/english -blunderbuss/ (https://perma.cc/85WE-LC9W) (last viewed Feb. 20, 2024) ("Few weapons inspire imagination about the sounds of a Revolutionary War battlefield like a blunderbuss. . . . With a short, large-caliber barrel just shy of fifteen inches and a flared muzzle, the blunderbuss was best for use at short range, to scatter shot or other damaging projectiles."). The government has never tried to carry its burden of showing a distinctly similar historical regulation (or a relevantly similar historical analogue, for that matter) to the NFA's provision barring possession of a

21

short-barrel rifle until it has been registered.

### D.    The NFA is an unconstitutional may-issue licensing regime.

The NFA is a may-issue licensing regime, which is not permitted by *Bruen*. The NFA's regulations require that an applicant state "[t]he reasons why there is a reasonable necessity for [the transferee] to purchase or otherwise acquire the device or weapon." 27 C.F.R. § 478.98(a). Likewise, the New York permitting scheme at issue in *Bruen* required an applicant who wanted to carry a handgun outside the home to "prove that proper cause exists to issue [the permit]." *Bruen*, 597 U.S. at 12 (citation omitted). There is no meaningful distinction between "reasonable necessity" in the NFA's regulations and "proper cause" in the New York statute that *Bruen* struck down. Both "grant[ ] open-ended discretion to licensing officials and authorize[ ] licenses only for those applicants who can show some special need." *Id.* at 79 (Kavanaugh, J., concurring).

In fact, the NFA's regulation is worse than New York's. While New York's "proper cause" requirement applies only to the *carrying* of firearms outside the home, the NFA's "reasonable necessity" regulation applies to the *possession* of certain firearms, even in one's home. The

22

NFA's may-issue licensing regime should fare no better than New York's.

Additionally, even if the NFA were a shall-issue licensing regime rather than a may-issue regime, the government still could not prevail. Although the Supreme Court suggested in dicta that shall-issue regimes would pass constitutional muster, it foreshadowed the situation here: "because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Id.* at 38 n.9. That is exactly the situation here: an average wait time of over six months for ATF to approve a properly completed application. ATF, *Current Processing Times*, *supra*. So average, law-abiding, adult applicants can expect to wait about the length of a full National Football League season before they may possess certain firearms protected by the Second Amendment. To accept this delay would render the Second Amendment a "'second-class right.'" *Bruen*, 597 U.S. at 70 (quoting *McDonald*, 561 U.S. at 780). This Court should not abide that result. Because the NFA "prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms," it is

unconstitutional. *Id.* at 71.

## III.  The NFA is an unconstitutional tax on the exercise of a constitutional right.

"[A]ny tax must [ ] comply with other requirements in the Constitution." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 570 (2012). The Supreme Court's "fee jurisprudence" reviews the constitutionality of taxes imposed on the exercise of constitutional rights. The seminal fee jurisprudence cases are two First Amendment cases: *Cox v. New Hampshire*, 312 U.S. 569 (1941) and *Murdock v. Pennsylvania*, 319 U.S. 105 (1943).

In *Cox*, the Supreme Court upheld the convictions of five Jehovah's Witnesses for holding a parade without obtaining the proper license. 312 U.S. at 570, 578. The Court explained that the fee the Witnesses would have had to pay to obtain the license was "not a revenue tax, but one to meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed." *Id.* at 577. Because "[t]here is nothing contrary to the Constitution in the charge of a fee limited to the purpose stated," the Court affirmed their convictions. *Id.* at 577–78.

Just two years later, the Supreme Court faced a similar case in

24

which eight Jehovah's Witnesses were convicted of "distributing literature and soliciting people to 'purchase' certain religious books and pamphlets" without obtaining the proper license. *Murdock*, 319 U.S. at 106. But the required license there differed from the one required in *Cox*. For the *Murdock* Witnesses to obtain the license, they would have had to pay certain flat fees depending on how many days they wished to solicit. *Id.*

The Court struck down this license fee requirement because it was "a tax laid specifically on the exercise of [First Amendment] freedoms." *Id.* at 108. As the Court explained, First Amendment rights "are available to all, not merely to those who can pay their own way." *Id.* at 111. The prosecution argued that the license fee was not susceptible to constitutional challenge since it did not in fact suppress or control constitutional activity, but the Court rejected that argument because the government "may not impose a charge for the enjoyment of a right granted by the federal constitution." *Id.* at 112–13. The Court also noted that, unlike in *Cox*, the fee was "not a nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question." *Id.* at 114. Instead, it was "a flat license tax levied and collected

25

as a condition to the pursuit of activities whose enjoyment is guaranteed by the First Amendment." *Id.* Because the license fee requirement was a tax on the Witnesses' exercise of their constitutional rights, the Court reversed their convictions. *Id.* at 117.

The rule to be taken from *Cox* and *Murdock* is that a license tax may be permissible if it is geared "to meet the expense incident to the administration of the act," *Cox*, 312 U.S. at 577, but not if it is a flat tax "charge[d] for the enjoyment of a right granted by the federal constitution." *Murdock*, 319 U.S. at 113.

This Court later expanded on *Cox* and *Murdock* to broaden the protections available to those who wish to avail themselves of their constitutional rights. In *Central Florida Nuclear Freeze Campaign v. Walsh*, this Court considered an Orlando ordinance requiring those seeking to demonstrate in a public forum to prepay fees expected to be incurred for police protection. 774 F.2d 1515, 1516 (11th Cir. 1985). This Court held that the ordinance was unconstitutional both facially and as applied. *Id.* In discussing *Cox* and *Murdock*, this Court "read *Cox* as authorizing only nominal charges for the use of city streets and parks to further First Amendment activities" and that "[a]n ordinance which

26

charges more than a nominal fee for using public forums for public issue speech, violates the First Amendment." *Id.* at 1523. This Court noted that the ordinance also ignored an applicant's ability to pay, which denied indigent people an opportunity to avail themselves of their constitutional rights. *Id.* Thus, the ordinance was unconstitutional. *Id.* at 1526.

This Court has not yet applied these fee-jurisprudence principles to the Second Amendment. *See Bolatete*, 977 F.3d at 1035 (noting on plain-error review that neither this Court nor the Supreme Court had decided the issue). But the District of Columbia and Second Circuits—the only circuit courts to decide the question—have both done so. *See Heller v. District of Columbia*, 801 F.3d 264, 278 (D.C. Cir. 2015); *Kwong v. Bloomberg*, 723 F.3d 160, 165 (2d Cir. 2013); *cf. Heller*, 554 U.S. at 595 (likening limitations on the Second Amendment to limitations on the First Amendment). Those circuits were correct to apply the Supreme Court's fee jurisprudence in the Second Amendment context because it is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald*, 561 U.S. at 780 (plurality opinion).

The NFA's $200 flat transfer tax is "a charge for the enjoyment of a

right granted by the federal constitution" and is therefore unconstitutional. *Murdock*, 319 U.S. at 113; *cf. McCulloch v. Maryland*, 17 U.S. 316, 431 (1819) ("That the power to tax involves the power to destroy . . . [is a] proposition[ ] not to be denied."). It is "a flat license tax levied and collected as a condition to the pursuit of activities whose enjoyment is guaranteed by the [Second] Amendment." *Murdock*, 319 U.S. at 114. There is no suggestion that the amount of the tax, which has remained unchanged since its enactment nearly a century ago, National Firearms Act of 1934, Pub. L. No. 73-474, § 3(a), 48 Stat. 1236, 1237 (codified as amended at 26 U.S.C. § 5811(a)), bears any connection "to meet[ing] the expense incident to the administration of the act," *Cox*, 312 U.S. at 577.

Nor does the NFA consider an applicant's ability to pay the $200 flat tax. This lack of consideration denies indigent persons an opportunity to avail themselves of their constitutional rights. *See Cent. Fla. Nuclear*, 774 F.2d at 1523. It also will not do to argue that if a person can afford to buy an NFA weapon, then they can afford to pay the tax. The tax applies whether the person purchases the weapon at fair market value or obtains it for free, such as via a gift or inheritance. *See* 26 U.S.C.

§ 5811(a) ("There shall be levied, collected, and paid on firearms transferred a tax at the rate of $200 for each firearm transferred . . . ."); 26 U.S.C. § 5845(j) (defining "transfer" to "include selling, assigning, pledging, leasing, loaning, giving away, or otherwise disposing of").

The NFA's transfer tax violates the principles of *Cox* and *Murdock*. As a tax on the exercise of a constitutional right unrelated to the cost of administering the program, it is unconstitutional both facially and as applied.

## IV. The NFA exceeds Congress's power to tax and violates the Tenth Amendment.[7]

While the States have broad authority to enact legislation for the public good, the Federal Government has no such authority and "can exercise only the powers granted to it." *McCulloch*, 17 U.S. at 405. Congress has the enumerated power to lay and collect taxes. U.S. Const. art. I, § 8, cl. 1. Using that power, Congress may levy taxes to influence conduct. *See Sebelius*, 567 U.S. at 567. Still, courts must read the Constitution's grant of the power to tax "carefully to avoid creating a

---

[7] Mr. Robinson recognizes that this argument is foreclosed by *Bolatete*, but he raises it here to preserve it for further appellate review.

general federal authority akin to the police power." *Id.* at 536.

To determine whether an exaction is a tax or a penalty, the Supreme Court applies a "functional approach," focusing on "practical characteristics of the so-called tax." *Id.* at 565. The NFA was enacted based on Congress's power to lay and collect taxes. U.S. Const. art. I, § 8, cl. 1. (granting Congress the "Power to lay and collect Taxes"). But in using a "functional approach" and looking at the NFA's practical characteristics, it does not look like a tax for three reasons.

First, the NFA is enforced by the ATF and the Department of Justice, rather than the IRS and the Department of the Treasury. *See* Bureau of Alcohol, Tobacco, Firearms and Explosives, *ATF History Timeline*, https://www.atf.gov/our-history/atf-history-timeline (https://perma.cc/A4V3-UKBL) (last visited Feb. 20, 2024) (January 2003 timeline entry). Second, failing to pay the $200 fee carries a significant penalty—up to 10 years imprisonment. 26 U.S.C. § 5871. Third, the $200 exaction the NFA imposes on the transfer of short-barrel rifles neither looks nor functions as a revenue-raising measure. *See Sebelius*, 567 U.S. at 563–64, 566 (applying a functional approach to determine that the shared responsibility payment was a tax). Because the criminal penalties

30

for violating the NFA function as an exercise of general police power, not the enumerated power to tax, the NFA is unconstitutional under the Tenth Amendment.

## CONCLUSION

For these reasons, Mr. Robinson asks the Court to vacate his conviction and judgment, and remand with instructions to dismiss the indictment with prejudice.

Respectfully submitted,

A. FITZGERALD HALL, ESQ.
Federal Defender

 s/ Matthew D. Cavender
MATTHEW D. CAVENDER, ESQ.
Research and Writing Attorney
201 South Orange Ave., Suite 300
Orlando, FL 32801
407-648-6338
Matthew_Cavender@fd.org

*Counsel for Appellant*

31

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation in Rule 32(a)(7)(B) because it contains 5,722 words, excluding the parts exempted by Rule 32(f).

*s/ Matthew D. Cavender*
MATTHEW D. CAVENDER, ESQ.

*Counsel for Appellant*
