No. 23-12551

_____

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

**UNITED STATES OF AMERICA**,

*Appellee*

v.

**DAVID ROBINSON JR.**,

*Appellant*

_____

Appeal from the United States District Court
for the Middle District of Florida

No. 5:22-cr-00072-GAP-PRL

_____

**APPELLANT'S REPLY BRIEF**

_____

A. FITZGERALD HALL, ESQ.
Federal Defender

MATTHEW D. CAVENDER, ESQ.
Research and Writing Attorney
201 South Orange Ave., Suite 300
Orlando, FL 32801
407-648-6338
Matthew_Cavender@fd.org

*Counsel for Appellant*

No. 23-12551

*United States v. David Robinson Jr.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The Certificates of Interested Persons listed in the parties' principal briefs are complete.

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure Statement ........................................................................... C-1

Table of Citations .................................................................. ii

Argument ................................................................................ 1

    I.    *Miller* and *Wilson* do not preclude Mr. Robinson's claim ....... 1

    II.    The NFA violates the Second Amendment ............................ 7

        A.    Short-barrel rifles are protected arms under the Second Amendment. ................................................................ 7

            1.    Short-barrel rifles are in common use. ................. 7

            2.    Short-barrel rifles are not dangerous and unusual. ................................................................. 9

        B.    Mr. Robinson's relevant course of conduct was possessing a short-barrel rifle, not possessing an unregistered short-barrel rifle. .................................. 10

        C.    There is no historical tradition requiring people to register and pay taxes on firearms before possessing them. ........................................................................... 12

            1.    The why is different. .......................................... 14

            2.    The how is different. .......................................... 15

    III.    The NFA's $200 tax is an unconstitutional tax on the exercise of a constitutional right. ........................................ 22

Conclusion ........................................................................... 23

Certificate of Compliance ................................................... 24

i

# TABLE OF CITATIONS

## Cases

*Aymette v. State*,
  21 Tenn. (2 Humph.) 154 (1840) ........................................ 1–2

*Caetano v. Massachusetts*,
  577 U.S. 411 (2016) ........................................................... 7–8

*Cox v. New Hampshire*,
  312 U.S. 569 (1941) ........................................................ 22–23

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ................................................. 1, 8, 19, 21

*Edwards v. Prime, Inc.*,
  602 F.3d 1276 (11th Cir. 2010) ............................................. 3

*Erlinger v. United States*,
  144 S. Ct. 1840 (2024) ........................................................ 21

*Espinoza v. Mont. Dep't of Revenue*,
  591 U.S. 464 (2020) ............................................................ 21

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015) ................................................. 9

*Mock v. Garland*,
  75 F.4th 563 (5th Cir. 2023) .................................................. 8

*Murdock v. Pennsylvania*,
  319 U.S. 105 (1943) ........................................................ 22–23

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022) ............................................. 10–13, 19–23

*Teixeira v. County of Alameda*,
  873 F.3d 670 (9th Cir. 2017) ............................................... 14

*United States v. Cox*,
   906 F.3d 1170 (10th Cir. 2018) ..........................................3–4

*United States v. Miller*,
   307 U.S. 174 (1939) ...................................................1–3, 6–7

*United States v. Rahimi*,
   144 S. Ct. 1889 (2024) ........................... 12–13, 15, 19–20, 22

*United States v. Wilson*,
   979 F.3d 889 (11th Cir. 2020) ............................................1, 6

*Watson v. Stone*,
   4 So. 2d 700 (Fla. 1941)....................................................18

## Statutes

26 U.S.C. § 5861(d)........................................................................11

28 U.S.C. § 5845(c) .........................................................................3

28 U.S.C. § 5845(d)........................................................................3

Act of Dec. 7, 1866, no. 41, § 1, 1866 Ga. Laws 27 ........................18

Act of Feb. 16, 1859, ch. 25, sched. A, § 27(15), 1858 N.C. Sess.
   Laws 28.................................................................................19

Act of Feb. 2, 1857, ch. 34, § 23(4), 1856 N.C. Sess. Laws 28 .......19

Act of Feb. 7, 1867, ch. CCXLIX, § 1, 1867 Miss. Laws 327..........16

## Regulations

27 C.F.R. § 478.98(a) ..................................................................15

# Other Authorities

Andrew Glass, *Georgia Readmitted to Union, July 15, 1870*,
    Politico (July 15, 2014, 5:05 AM), https://www.politico.com/
    story/2014/07/georgia-civil-war-108886 ................................ 19

Andrew Glass, *Mississippi Readmitted to the Union, Feb. 23, 1870*,
    Politico (Feb. 23, 2008, 6:34 AM), https://www.politico.com/
    story/2008/02/mississippi-readmitted-to-the-union-feb-23-
    1870-008640 ......................................................................... 18

*B&T SPC9 SBR*, Impact Guns, https://perma.cc/L6LD-AZ5D ....... 5

Carolyn Crist, *Handguns more lethal than rifles in mass
    shootings*, Reuters (Dec. 31, 2018, 1:45 PM),
    https://www.reuters.com/article/idUSKCN1OU11F/ ........... 10

*Class 3*, Impact Guns, https://perma.cc/3ZEM-WB8D .............. 5, 10

*Differences Between Rifles and Shotguns*, First Time Gun Buyer,
    https://perma.cc/F978-NVC4 ................................................... 4

*Differences Between Rifles, Shotguns, and Handguns*, Hunter-ed,
    https://perma.cc/R4MQ-UFCK ................................................ 4

H.J., 42nd Cong., 2d Sess. 716 (1872) ........................................... 17

Jared Keller, *The Army Has Finally Fielded Its Next Generation
    Squad Weapons*, Military.com (Mar. 29, 2024, 12:45 PM),
    https://perma.cc/NTM2-5GPW ................................................. 2

Jonathan Lehrfeld, *101st Airborne First Army Unit to Field Next
    Generation Squad Weapons*, Army Times (Mar. 29, 2024),
    https://perma.cc/9PFT-TWMX .................................................. 2

Oliver Krawczyk, *Dangerous and Unusual: How an Expanding
    National Firearms Act Will Spell Its Own Demise*, 127 Dick.
    L. Rev. 273 (2022) ........................................................... 14, 15

Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55 (2017) .............................................................................. 16, 22

*Shotgun vs rifle for hunting*, Beasafehunter.org, https://perma.cc/ET7J-6ZSX .................................................... 5

*Shotgun vs. Rifle: Which is Better?*, Liberty Safe, https://perma.cc/QS7J-232U .................................................... 5

*Sig Sauer MCX Spear SBR*, Impact Guns, https://perma.cc/72AJ-VBEH .................................................... 6

*Washington County*, Mississippi Encyclopedia, https://perma.cc/AAU5-MS62 .............................................. 17

## ARGUMENT

## I.    *Miller* and *Wilson* do not preclude Mr. Robinson's claim.

The government argues that this Court must affirm based on *United States v. Miller*, 307 U.S. 174 (1939) and *United States v. Wilson*, 979 F.3d 889 (11th Cir. 2020). Gov't Br. at 7–11. Not so.

As the Supreme Court explained in *District of Columbia v. Heller*, the only remaining holding from *Miller* is that the Second Amendment's protections "extend[ ] only to certain types of weapons." 554 U.S. 570, 623 (2008). So what are those weapons? In *Miller*, the Court held that it could not consider short-barrel shotguns to be protected "arms" without "evidence tending to show that possession or use of a [short-barrel shotgun] at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia." 307 U.S. at 178. Citing the Tennessee Supreme Court's decision in *Aymette v. State*, the Court explained that it was "not within judicial notice that [a short-barrel shotgun] is any part of the ordinary military equipment or that its use could contribute to the common defense." *Id.* (citing *Aymette v. State*, 21 Tenn. (2 Humph.) 154, 158 (1840)). *Aymette*, in turn, held that the right to bear arms protects those arms "as are usually employed in civilized

1

warfare, and that constitute the ordinary military equipment." 21 Tenn. at 158.

That holding puts the government in a bind. If the government disclaimed *Miller*, then the government would have had to forgo its argument, Gov't Br. at 8–10, that this Court is bound to affirm based on *Miller*'s conclusions about short-barrel shotguns. But in embracing *Miller*, the government runs headlong into the fact that, under *Miller*, the Second Amendment protects arms that are "part of the ordinary military equipment." 307 U.S. at 178. And the government did not dispute Mr. Robinson's assertion in his initial brief, Robinson Br. at 20, that the standard-issue rifle for the United States Army and Marines is an M4 carbine with a 14.5-inch barrel—a short-barrel rifle.[1] How a short-barrel rifle can be the standard-issue rifle for our Nation's military, yet not be "part of the ordinary military equipment," *Miller*, 307 U.S. at 178, is left to the reader's imagination.

---

[1] The military is in the process of replacing the M4 with the XM7, which has an even shorter barrel—13 inches. *See* Jared Keller, *The Army Has Finally Fielded Its Next Generation Squad Weapons*, Military.com (Mar. 29, 2024, 12:45 PM), https://perma.cc/NTM2-5GPW; Jonathan Lehrfeld, *101st Airborne First Army Unit to Field Next Generation Squad Weapons*, Army Times (Mar. 29, 2024), https://perma.cc/9PFT-TWMX.

Instead, the government relies on a sleight of hand by asking this Court to simply pretend that short-barrel shotguns and short-barrel rifles are the same. *See* Gov't Br. at 7. They are not. *See* 28 U.S.C. § 5845(c) (defining "rifle"); 28 U.S.C. § 5845(d) (defining "shotgun"). This Court has "pointed out many times that regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010). And *Miller* turned on the features of short-barrel shotguns and the lack of any evidence tending to show that they were part of the ordinary military equipment or could contribute to the common defense. 307 U.S. at 178. Whatever the merits of that conclusion about short-barrel shotguns, it does not apply to short-barrel rifles—the main weapon of choice for our Nation's infantry.

The primary support for the government's argument that short-barrel rifles and short-barrel shotguns are the same is the Tenth Circuit's decision in *United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018). Gov't Br. at 7–8. There, in a pre-*Bruen* decision, the Tenth Circuit considered a challenge to a conviction for possessing an unregistered short-barrel rifle. *Cox*, 906 F.3d at 1174. In one sentence of analysis on the difference

3

between short-barrel shotguns and short-barrel rifles, the Tenth Circuit simply said that "[the defendant] has offered no meaningful distinction between the two." *Id.* at 1186. Yet the Tenth Circuit left open the possibility that a different record or argument could result in a different outcome. *See id.*

The outcome should be different here because there are a host of differences between short-barrel shotguns and short-barrel rifles that the Tenth Circuit did not consider. Shotguns and rifles exhibit distinct characteristics that set them apart in design, functionality, and application. One notable difference lies in their barrels: shotguns typically feature a smooth bore, lacking the rifling grooves found in rifle barrels. *Differences Between Rifles and Shotguns*, First Time Gun Buyer, https://perma.cc/F978-NVC4. This distinction affects the ammunition they use, with shotguns using shells containing multiple pellets or a single slug, while rifles use cartridges containing a single projectile, propelled by a casing filled with propellant powder. *Id.* Rifles, with their rifled barrels and single-projectile design, offer superior accuracy and range. *Differences Between Rifles, Shotguns, and Handguns*, Hunter-ed, https://perma.cc/R4MQ-UFCK. Shotguns, favored for their stopping

power at close range, are commonly used in hunting birds and small game. *Shotgun vs rifle for hunting*, Beasafehunter.org, https://perma.cc/ET7J-6ZSX. Additionally, while both can be effective home defense weapons, they have substantial differences. Among other differences, a rifle shoots a single, high-speed projectile more accurately and with less chance of a stray projectile missing the target, while a shotgun is generally simpler to operate and hits its target with more energy. *Shotgun vs. Rifle: Which is Better?*, Liberty Safe, https://perma.cc/QS7J-232U. The bottom line is that rifles and shotguns are simply not the same weapon, despite the government's attempt to lump them together.

The government also argues that both short-barrel shotguns and short-barrel rifles are just "long gun[s] with a shortened barrel." Gov't Br. at 7. But that is not so. Short-barrel rifles are readily available off-the-shelf with barrels as short as 4.5 inches. *See, e.g.*, *Class 3*, Impact Guns, https://perma.cc/3ZEM-WB8D (listing dozens of short-barrel rifles available for purchase); *B&T SPC9 SBR*, Impact Guns, https://perma.cc/L6LD-AZ5D (rifle with a 4.5-inch barrel). One of the short-barrel rifles readily available for purchase is the civilian version of

the military's new XM7 with its 13-inch barrel. *Sig Sauer MCX Spear SBR*, Impact Guns, https://perma.cc/72AJ-VBEH. These are not long guns that someone took a hacksaw to; they are designed as short-barrel rifles from the ground up.

The government also relies on *Wilson*, but that is similarly unavailing. The government claims that this Court "rejected as 'frivolous' a Second Amendment challenge to a conviction for possessing an unregistered short-barrel shotgun." Gov't Br. at 10. But that is not the argument that this Court found frivolous. There, the defendant, who was convicted of possessing an unregistered short-barrel shotgun, argued that the district court lacked subject matter jurisdiction because the NFA was facially unconstitutional. *Wilson*, 979 F.3d at 903. But this Court concluded that "this contention is . . . frivolous" because a "district court has subject matter jurisdiction over a criminal case so long as the indictment itself alleges a violation of a federal statute, regardless of any constitutional challenge to the criminal statute." *Id*. That was the frivolous argument—the subject matter jurisdiction one. This Court also rejected his substantive Second Amendment argument, but that was solely based on *Miller*. *Id*. So *Wilson* rises and falls with *Miller*, and for

6

the reasons discussed above, *Miller* does not preclude Mr. Robinson's claim. It supports it.

## II.   The NFA violates the Second Amendment.

### A.   Short-barrel rifles are protected arms under the Second Amendment.

#### 1.   *Short-barrel rifles are in common use.*

The government suggests that over a half-million short-barrel rifles is not enough to show that they are in common use.[2] Gov't Br. at 14–15. That argument is undercut by Supreme Court precedent. In *Caetano v. Massachusetts*, the Court considered the constitutionality of a state law prohibiting the possession of stun guns. 577 U.S. 411, 411 (2016) (per curiam). The Court ultimately held that the state court applied the wrong standard in evaluating the constitutionality of the ban, so it vacated the judgment and remanded the case for further proceedings. *Id.* at 411–12.

---

[2] The government also quarrels with Mr. Robinson presenting these statistics to this Court. Gov't Br. at 14, 16. But nothing cited by the government suggests that this Court cannot consider statistical information that was not presented to the district court. Besides, even if this Court were to agree with the government, that would warrant vacating the judgment and remanding the case to the district court to conduct an evidentiary hearing. He requested one, Doc. 32 at 12, but the district court ruled without even hearing oral argument, much less holding an evidentiary hearing. He should not be precluded from presenting relevant evidence and then be punished for it.

Yet stun guns are owned by only about 200,000 people. *See id.* at 420 (Alito, J., concurring). As Justice Alito explained, it was "beside the point" that the number of stun guns was dwarfed by the number of firearms. *Id.* Instead, "[t]he more relevant statistic is that hundreds of thousands of Tasers and stun guns have been sold to private citizens." *Id.* (cleaned up and citations omitted). Likewise, the fact that there are fewer short-barrel rifles in circulation than handguns or standard rifles is "beside the point" because short-barrel rifles "are widely owned and accepted as a legitimate means of self-defense across the country." *Id.*

Also, the half-million number drastically understates the number of short-barrel rifles in circulation, at least according to the government. That is because the government's official position is that almost all braced pistols are properly classified as short-barrel rifles. *See Mock v. Garland*, 75 F.4th 563, 574 (5th Cir. 2023). By the government's estimate, there are between three and seven million braced pistols in circulation. *Id.* at 581–82. So the actual number of short-barrel rifles is around 532,000, plus three to seven million. This case does not require drawing a constitutional line at a specific number of firearms that must be in circulation for them to be "in common use." *Heller*, 554 U.S. at 627.

Numbering in the millions is enough. *See also Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) ("[I]t would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity.").

### 2.    *Short-barrel rifles are not dangerous and unusual.*

As to the dangerousness of short-barrel rifles, the government does not question the accuracy of the statistics Mr. Robinson presented in his initial brief about how infrequently rifles of all types are used to commit murder. Robinson Br. at 16–18. Instead, the government makes the odd point that he did not also address crimes other than murder. Gov't Br. at 16. It is unclear what other crimes the government is concerned about, much less why it thinks there may be an unreported epidemic of, say, convenience store robberies committed with short-barrel rifles (or rifles generally).

Instead, unburdened by evidentiary support, the government argues that short-barrel rifles are "inherently dangerous" because of their concealability and heightened capability to cause damage "no matter how many people are murdered with them." *Id.* There are a few

problems with that. First, the government overstates the concealability of short-barrel rifles. Short-barrel rifles are still large weapons that cannot be concealed under anything short of a trench coat. One need merely peruse the dozens of readily-available, off-the-shelf short-barrel rifles to confirm that obvious fact. *See Class 3*, Impact Guns, https://perma.cc/3ZEM-WB8D. For concealability, short-barrel rifles are a poor substitute for handguns.

The government, citing nothing, also overstates short-barrel rifles' "heightened capability to cause damage." Gov't Br. at 16. In fact, a study of mass shootings found that handguns were more lethal than rifles. Carolyn Crist, *Handguns more lethal than rifles in mass shootings*, Reuters (Dec. 31, 2018, 1:45 PM), https://www.reuters.com/article/idUSKCN1OU11F/. Simply saying, without evidentiary support, that short-barrel rifles have a "heightened capability to cause damage," Gov't Br. at 16, is not enough.

**B.    Mr. Robinson's relevant course of conduct was possessing a short-barrel rifle, not possessing an unregistered short-barrel rifle.**

Next, in an effort to steal a base and avoid the historical scrutiny mandated by *Bruen*, the government turns the course-of-conduct

requirement on its head. Under *Bruen*, this Court must consider "whether the plain text of the Second Amendment protects [Mr. Robinson's] . . . course of conduct."[3] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 32 (2022). Under the government's reading, his course of conduct is not merely possessing a short-barrel rifle, but is instead possessing an *unregistered* short-barrel rifle. This conduct, the government argues, is not protected by the Second Amendment. Gov't Br. at 16. That is wrong. In *Bruen*, the Court considered whether carrying a handgun publicly for self-defense was protected by the Second Amendment, not whether *unlicensed* carry was protected. *See* 597 U.S. at 9–10. Likewise, the question here is whether possessing a short-barrel rifle is protected by the Second Amendment, not whether *unregistered* possession is protected.

The status of the short-barrel rifle as registered or unregistered has no bearing on conduct. The conduct being penalized is Mr. Robinson's possession, not the failure to register. *See* 26 U.S.C. § 5861(d) (providing

---

[3] In *Bruen*, it was the petitioners' *proposed* course of conduct, as they brought their civil case after their applications for unrestricted carry licenses were denied, *id.* at 16–17, but here it is Mr. Robinson's *actual* course of conduct, as his case arises from a criminal prosecution.

that it is unlawful "to receive or possess" an unregistered short-barrel rifle). Registration also has no bearing on the dangerousness or functionality of the weapon. Instead, it is a firearm regulation that is properly analyzed at the historical analogue step, not the conduct step.

**C.    There is no historical tradition requiring people to register and pay taxes on firearms before possessing them.**

Because Mr. Robinson's conduct of possessing a short-barrel rifle is protected by the Second Amendment, the central question here is whether there is a historical tradition of requiring people to register and pay taxes on certain firearms before possessing them. *See Bruen*, 597 U.S. at 24 ("When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."). The government bears the burden of justifying its regulation. *United States v. Rahimi*, 144 S. Ct. 1889, 1897 (2024). As the Supreme Court explained, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 1898 (citing

*Bruen*, 597 U.S. at 26–31). "[C]entral to this inquiry" are "[w]hy and how the regulation burdens the right." *Id.*

So what are the why and how of the historical regulations offered by the government? The government cites a handful of colonial-era laws regulating the trafficking of arms and ammunition:

- A 1652 New York law outlawing illegal trading of guns, gun powder, and lead by private individuals;

- A 1631 Virginia law requiring the recording of all new arrivals to the colony, and of arms and munitions;

- An early-17th century Connecticut law banning residents from selling firearms outside the colony;

- A Virginia law stating that colonists could sell firearms and ammunition to loyal subjects inhabiting the colony;

- "[O]ther colonial governments controlled the conditions of trade in firearms";

- Six colonies' laws outlawing selling or providing firearms or ammunition to Native Americans; and

- An unspecified number of states during the 1800s "imposed various taxes on personally held firearms."

Gov't Br. at 20 (citations omitted). The government acknowledges that the NFA is "not identical to those historical regulations." *Id.* at 21. That is quite an understatement. Not only are those historical regulations not identical to the NFA's regulations, the how and why those regulations

13

burdened the Second Amendment are so dissimilar as to be contradictory.

### 1.    *The why is different.*

The purpose of those colonial laws was to make sure that the population was sufficiently armed, not to disarm it. *See Teixeira v. County of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017) (en banc). As the Ninth Circuit explained, "the emphasis of the colonial governments was on ensuring that the populace was well armed, not on restricting individual stocks of weapons." *Id.* (cleaned up and citation omitted). Those governments restricted the sale of firearms because it wanted to make sure that its population remained sufficiently armed to "protect[ ] vulnerable colonial settlements, especially from Indian tribes resisting colonial conquest, and from foreign forces." *Id.* at 684 (citations omitted). "Governmental involvement in the provision, storage, and sale of arms and gunpowder is consistent with the purpose of maintaining an armed militia capable of defending the colonies." *Id.* at 685. The NFA, in contrast, was passed to keep certain firearms out of the public's hands. *See* Oliver Krawczyk, *Dangerous and Unusual: How an Expanding National Firearms Act Will Spell Its Own Demise*, 127 Dick. L. Rev. 273, 276–80 (2022). Talk about a different "why."

14

### 2. *The how is different.*

The "how" is also substantially different. The NFA's requirements
are onerous:

- File an ATF application form;

- Pay the $200 tax;

- Submit photo identification, fingerprints, and other personal
  information;

- Notify local authorities;

- Explain why it is reasonably necessary to acquire the firearm;

- Wait many months for approval;

- After approval, be listed in a national database with the firearm's
  serial number;

- Not cross state lines without ATF permission;

- Notify ATF of any address change; and

- While in possession of the firearm, maintain registration
  documentation and give it to an ATF officer upon request.

*Id.* at 289–90; 27 C.F.R. § 478.98(a). Virtually none of those requirements
have a Founding-era counterpart. Only one law cited by the
government—the 1631 Virginia law—involved registration of individuals
and their firearms. Yet even this solitary example did not require pre-
possession registration or impose a tax, and thus the "how" for even that
one law is not "relevantly similar" to the NFA. *Rahimi*, 144 S. Ct. at 1898.

15

The government's only reference to laws requiring payment of a fee or tax is where the government claims that "throughout the 1800s, the states imposed various taxes on personally held firearms." Gov't Br. at 20 (citing Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 76–77 (2017)). There are a host of problems with that claim.

First, in the cited law review article, the author cites a grand total of three states that imposed taxes on personally held firearms—North Carolina in 1856 and 1858, Georgia in 1866, and Mississippi in 1867. But the author, and by extension the government, left out important context.

Take the Mississippi law. It provided that

> a tax of not less than five dollars or more than fifteen dollars shall be levied and assessed annually by the board of Police *of Washington county* upon every gun and pistol which may be in the possession of any person *in said county*, which *tax shall be payable at any time on demand*, by the Sheriff, and if not so paid, it shall be the duty of the Sheriff to *forthwith distrain and seize such gun or pistol*, and sell the same for cash at the door of the Court House . . . .

Act of Feb. 7, 1867, ch. CCXLIX, § 1, 1867 Miss. Laws 327, 327, available at https://perma.cc/6KWZ-TJX2 (emphasis added). One may ask: Why

16

would the state[4] of Mississippi impose a firearms tax that was only applicable in a single county? Why was the tax payable at any time on demand? And why was the penalty for failure to pay the tax immediate forfeiture of the firearm? First, consider the enactment date: February 7, 1867—less than two years after Robert E. Lee's April 9, 1865 surrender at Appomattox Court House. Next, consider Washington County's demographics: "On the eve of the Civil War, Washington County's population was 15,679, with 14,467 of those residents enslaved."[5] *Washington County*, Mississippi Encyclopedia, https://perma.cc/AAU5-MS62. It takes little imagination to see why the Mississippi legislature, in the immediate aftermath of the Civil War, was interested in imposing a then-substantial tax, payable on demand upon penalty of forfeiture, on firearms possessed by people only in the most heavily African American county in the state. *Cf.* H.J., 42nd Cong., 2d Sess. 716 (1872), available at https://perma.cc/899C-HAEY (letter from President Grant to the

---

[4] More on this later. *Infra* at 18–19.

[5] Its demographics were substantially the same after the war: "With African Americans comprising 86.2 percent of the population, Washington County continued to have the state's largest African American majority." *Id.*

House of Representatives stating that the Ku Klux Klan's objectives "were by force and terror . . . *to deprive colored citizens of the right to bear arms* . . . , and to reduce the colored people to a condition closely akin to that of slavery" (emphasis added)); *see also Watson v. Stone*, 4 So. 2d 700, 703 (Fla. 1941) (Buford, J., concurring) (discussing a similar Florida firearm registration statute that "was never intended to be applied to the white population and in practice has never been so applied").

The Georgia statute, while not so transparently racist, is also limited. That statute, also enacted less than two years after the Civil War, only applied in three counties and only applied to a firearm "over the number of three" on any plantation in those counties. Act of Dec. 7, 1866, no. 41, § 1, 1866 Ga. Laws 27, 27–28, available at https://perma.cc/6XXQ-93G8.

The Georgia and Mississippi statutes are also of dubious relevance because at the time of their passage neither state had even been readmitted to the Union. Mississippi was not readmitted until February 23, 1870. Andrew Glass, *Mississippi Readmitted to the Union, Feb. 23, 1870*, Politico (Feb. 23, 2008, 6:34 AM), https://www.politico.com/story/2008/02/mississippi-readmitted-to-the-union-feb-23-1870-008640.

18

Georgia was not readmitted until July 15, 1870. Andrew Glass, *Georgia Readmitted to Union, July 15, 1870*, Politico (July 15, 2014, 5:05 AM), https://www.politico.com/story/2014/07/georgia-civil-war-108886. So those statutes are more like territorial laws that the Supreme Court has found are of questionable relevance. *See Bruen*, 597 U.S. at 67–69.

As for North Carolina's 1856 and 1858 statutes, neither taxed rifles (though the 1858 statute taxed "rifle canes"), and both exempted arms used for mustering—arms suitable for militia use. *See* Act of Feb. 16, 1859, ch. 25, sched. A, § 27(15), 1858 N.C. Sess. Laws 28, 35-36, available at https://perma.cc/82W9-EN8H; Act of Feb. 2, 1857, ch. 34, § 23(4), 1856 N.C. Sess. Laws 28, 34, available at https://perma.cc/ARF8-2VFP.

And those are not the only problems with the government's reliance on those statutes. For another thing, they are too late. The relevant historical timeframe is limited to the Founding because "'[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634–35). Although declining to definitively resolve the question in *Bruen* and *Rahimi* because the Court understood the Ratification-Reconstruction distinction not to affect the outcome of those cases, the

19

Court still made it clear that post-Founding history serves a merely confirmatory role of a Founding-era tradition that already has been established. *See id.* at 35 ("[W]e must . . . guard against giving postenactment history more weight than it can rightly bear."); *id.* at 36 ("[T]o the extent later history contradicts what the text says, the text controls."); *id.* at 37 (treating 19th-century evidence "as mere confirmation of what the Court thought had already been established"); *id.* ("[T]he scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."); *id.* at 66 ("[L]ate-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence."); *see also Rahimi*, 144 S. Ct. at 1924 (Barrett, J., concurring) ("[F]or an originalist, the history that matters most is the history surrounding the ratification of the text; that backdrop illuminates the meaning of the enacted law. History (or tradition) that long postdates ratification does not serve that function.").

Yet another problem with the government's reliance on those three states' statutes is that they are outliers. *Cf. Bruen*, 597 U.S. at 30 ("[C]ourts should not uphold every modern law that remotely resembles

a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." (cleaned up and citation omitted)). Aside from these bare Civil War-era examples covering one state and another four counties, the government offers nothing for this Court to rely on to support a conclusion that the NFA's registration tax aligns with our Nation's history and tradition, or the principles underlying the Second Amendment. This Court should not "'stake [its] interpretation of the Second Amendment upon a single law" (or three) "in effect in a single State" (plus a few stray counties) "that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense' in public." *Id.* at 65–66 (quoting *Heller*, 554 U.S. at 632) (cleaned up); *see also Erlinger v. United States*, 144 S. Ct. 1840, 1858 (2024) (rejecting examples of procedures in four states as being "not the kind of uniform postratification practice that can sometimes shed light upon the meaning of the Constitution" (citation omitted)); *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020) (rejecting examples of 19th-century laws from "more than 30 States" as failing to "establish an early American tradition").

True, current regulations need not be "identical to ones that could

be found in 1791," but they must be "relevantly similar." *Rahimi*, 144 S. Ct. at 1897–98. The "how" of the NFA's regulations are not even in the same ballpark.

## III. The NFA's $200 tax is an unconstitutional tax on the exercise of a constitutional right.

The government argues that the fee jurisprudence doctrine from *Cox v. New Hampshire*, 312 U.S. 569 (1941) and *Murdock v. Pennsylvania*, 319 U.S. 105 (1943) do not apply here because that doctrine uses means-end scrutiny and *Bruen* rejected the use of means-end scrutiny in the Second Amendment context. Gov't Br. at 23–24. So according to the government, only the *Bruen* test needs to be satisfied. *Id.* If the government is correct, so much the better for Mr. Robinson. Considering the NFA's $200 tax under the *Bruen* framework means that the government must show "a distinctly similar historical regulation" imposing a similar pre-possession tax. *Bruen*, 597 U.S. at 26. The government did not and cannot do so.

The only argument from the government about taxes on firearms is found elsewhere in its brief where it argues, in full, that "throughout the 1800s, the states imposed various taxes on personally held firearms." Gov't Br. at 20 (citing Spitzer, *supra*, at 76–77). But the cited statutes are

22

fundamentally different for the host of reasons discussed above.

So even if the government is correct that the *Bruen* analysis, rather than the *Cox / Murdock* framework, applies to Mr. Robinson's unconstitutional-tax argument, the government has failed to carry its burden of showing "a distinctly similar historical regulation" imposing a similar pre-possession tax. *Bruen*, 597 U.S. at 26.

## CONCLUSION

For the reasons stated above and in the initial brief, Mr. Robinson asks this Court to vacate his conviction and judgment, and remand with instructions to dismiss the indictment with prejudice.

Respectfully submitted,

A. FITZGERALD HALL, ESQ.
Federal Defender

 *s/ Matthew D. Cavender*
MATTHEW D. CAVENDER, ESQ.
Research and Writing Attorney
201 South Orange Ave., Suite 300
Orlando, FL 32801
407-648-6338
Matthew_Cavender@fd.org

*Counsel for Appellant*

23

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation in Rule 32(a)(7)(B) because it contains 4,592 words, excluding the parts exempted by Rule 32(f).

s/ Matthew D. Cavender
MATTHEW D. CAVENDER, ESQ.

*Counsel for Appellant*